IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TONYA LONGMIRE,
ADMINISTRATOR of the ESTATE of
DAI'YAAN QAMAR LONGMIRE, DECEASED,

Plaintiff,

v.  Civil Action No. 2:16cv653

CHANCE MCCOOLE and
LAKEIA SMALLWOOD,

Defendants.

## OPINION & ORDER

This matter came before the Court pursuant to Defendants Chance McCoole's ("McCoole's") and Lakeia Smallwood's ("Smallwood's") (collectively, "Defendants'") Motion for Summary Judgment ("Motion"). Doc. 118. At a hearing on November 28, 2017, the Court **DENIED** the Motion, and it now issues this Opinion & Order further explaining the reasoning for its decision.

### I.  BACKGROUND

#### A.  Procedural History

Plaintiff Tonya Longmire, Administrator of the Estate of Dai'yaan Qamar Longmire ("D. Longmire"), Deceased ("Plaintiff" or "Longmire") filed her Complaint in this Court on November 7, 2016. See Doc. 1. ("Compl.") Defendants filed an answer, Doc. 27, and a Motion to Dismiss, Doc. 28, on December 29, 2016. Plaintiff filed an Amended Complaint on January 23, 2017, Doc. 35, and Defendants responded with a Motion to Strike on February 13, 2017, Doc. 44. The Court GRANTED the Motion to Dismiss WITH LEAVE TO AMEND and GRANTED the Motion to Strike. Doc. 51.

Plaintiff filed her Second Amended Complaint on April 17, 2017. Doc. 52 ("Second Am. Compl."). Defendants filed a Motion to Dismiss on May 5, 2017. Doc. 55. The Parties stipulated to the dismissal of many Defendants. Docs. 88, 89. The Court DISMISSED the Third Claim for Relief and DISMISSED all Defendants except Smallwood, McCoole, and the Virginia Department of Corrections ("VDOC") but took the remainder of the Motion to Dismiss UNDER ADVISEMENT. Doc. 98. The Court also ORDERED Plaintiff to file reports cited in the Complaint. Id. After receiving the reports cited in the Complaint, Defendants filed a supplemental memorandum in support of their Motion to Dismiss seeking dismissal of VDOC. Doc. 114. The Court GRANTED the Motion to Dismiss, DISMISSING the First and Fourth Claims for Relief, which were against Defendant VDOC. Doc. 116.

The remaining claim against Defendants McCoole and Smallwood alleges a violation of 42 U.S.C. § 1983 consisting of "Deliberate Indifference to Serious Medical Needs in Violation of the Eighth Amendment." Second Am. Compl. ¶¶ 123–129. Defendants filed the instant Motion for Summary Judgment on November 1, 2017. Doc. 118. Plaintiff responded in opposition on November 15, 2017. Doc. 132. Defendants replied on November 20, 2017. Doc. 140.

## B. Undisputed Facts

Below are Defendants' facts that are uncontested in Plaintiff's brief:

1. On June 1, 2013, Longmire was charged with presenting a false identity to law enforcement, resisting arrest, and assault on law enforcement. On October 6, 2013, Longmire was charged with assault on law enforcement, grand larceny, conspiring to commit larceny, and burglary. (Ex.1, Criminal Record)

2. Longmire, age 19, was detained at the Virginia Beach Correctional Center ("VBCC") from October 7, 2013 to May 23, 2014. On May 5, 2014, Longmire was sentenced to four years in prison. He was classified as a "Youthful Offender" and on May 23, 2014 was transferred from VBCC to Indian Creek Correctional Center ("ICCC"). (Ex. 2, Sentencing Order 5/23/14)

2

> 3. ICCC is a "therapeutic community" described in the Inmate Orientation Manual as "an intensive residential treatment program ... designed and structured to promote change through social learning. Substance abuse and addiction are addressed, but the behaviors, attitudes, values and emotions of every member are also constantly monitored. The TC is designed to challenge and replace negative behaviors with new, pro-social attitudes, values and behaviors." (Ex. 3, Orientation Information)

Doc. 119 at 1–2.

> 5. Employing VDOC OP 730.2, Mental Health Services: Screening, Assessment, and Classification, which "establishes a standard protocol for the screening, assessment, and determination of the mental health status and mental health services needs of offenders incarcerated in Department of Corrections facilities," Dr. [James] Brockington[, ICCC's Qualified Mental Health Professional ("QMHP")] classified Longmire as MH-0. The classification "MH-0 No Mental Health Services Needs" is described as follows:
>> The offender has no documented history of mental health treatment within the past two years (this does not include treatment for alcohol or substance abuse alone, nor for evaluation purposes alone). There is no documented or reported behavior that currently indicates any mental health services needs. No monitoring or treatment by a QMHP is currently required.
>
> Dr. Brockington did not place any mental health restrictions on Longmire's housing or job assignment. (Ex. 6, VDOC OP 730.2; Ex. 7, Mental Health Classification)
>
> 6. Because of HIPAA, correctional officers at ICCC are not privy to inmates' medical or mental health records. They can only access inmates' mental health classifications. (Ex. 8, Rick White Aff; Ex. 9, Smallwood Dep. pp. 147-48)
>
> 7. For approximately four and one-half months, from his incarceration in May until October 4, 2014, Longmire was housed in the general population at ICCC. (Ex. 10, ICCC Discharge Summary)
>
> 8. On July 22, 2014, Longmire was charged with being in an unauthorized area. He was initially found guilty and penalized 10 days' loss of visitation. Longmire appealed the determination. Warden Keeling overturned the conviction and the charge was expunged from Longmire's record. (Ex. 11, Disciplinary Appeal letter 8/4/14)
>
> 9. During his time in the general population Longmire was approved for various work assignments, including in the kitchen. (Ex. 12, Coris Work Assignments)

3

10. On September 25, 2014, Longmire was denied parole. (Ex. 13, Parole Board Letter)

11. On October 5, 2014, Longmire was charged with aiding and abetting the theft of an inmate's canteen. Pursuant to VDOC OP 861.1, Offender Discipline, Institutions, he was placed on pre-hearing detention status and transferred to Housing Unit 7B, administrative segregation, to await his hearing. (Ex. 14, VDOC OP 861.1; Ex. 15, Electronic Detention Notice 10/5/14)

12. At the October 9, 2014 disciplinary hearing, Longmire was found guilty by the hearing officer and fined $12.00. Longmire appealed the decision to Warden Keeling who on October 27, 2014 decided that the charge should be reheard and the results of the initial hearing be expunged from Longmire's record. (Ex. 16, Disciplinary Appeal)

13. On November 4, 2014, Longmire's disciplinary charge was reheard and he was fined $12.00. (Ex. 17, Disciplinary Record)

14. Housing Unit 7A is a modified general population housing unit used to transition inmates from administrative segregation back to the general population. Housing Unit 7A has additional mandatory counseling programs related to the therapeutic community and is more restricted than general population housing units but has fewer restrictions than Housing Unit 7B. (Ex. 8, Rick White Aff.)

15. Longmire was moved from pre-hearing detention in Housing Unit 7B to Housing Unit 7A on October 14, 2014, for refresher therapeutic community training and for staff to make a decision regarding whether he would return to regular programming or be removed from the program. These decisions are similar for all inmates who are released from administrative segregation. (Ex. 8, Rick White Aff.)

16. On October 27, 2014, Longmire was observed yelling profanities at a corrections officer and was advised if the behavior continued he would be given an institutional charge for vulgar language. (Ex. 8, White Aff.)

17. On October 28, 2014, Longmire submitted the paperwork necessary to be considered for release back to the general population and to regular programming. Because he was seen and heard being loud, at times argumentative, and constantly being redirected for side-chatter and grooming non-compliance, release from Housing Unit 7A was not recommended. (Ex. 8, White Aff.)

18. On November 8, 2014, at approximately 7:49 a.m., Longmire was charged with simple assault upon a non-offender. Officer Smallwood had noticed that Longmire's cell was in disarray, had trash all over the floor, and that his footlocker was unsecured. She told Longmire he needed to get his cell into compliance and escorted Longmire to his cell. Longmire stepped inside, and as

Smallwood began closing the cell door, Longmire resisted by pushing the door back toward Smallwood. His action caused the door to hit Smallwood's right hand and jam her wrist. (Ex. 18, Disciplinary Offense Report)

19. Officer Smallwood reported this incident to the watch commander, who authorized her to write Longmire up for simple assault. Per VDOC OP 861.1, Offender Discipline, Institutions, Sgt. McCoole, Officer Smallwood's direct supervisor, prepared the final Disciplinary Offense Report, set a disciplinary hearing for November 13, 2014, and proposed a penalty of 30 days' disciplinary segregation. (Ex. 9, Smallwood Dep., p. 58-59; Ex. 18, Disciplinary Offense Report)

Id. at 2–5.

21. Along with other officers, Sgt. McCoole moved Longmire from Housing Unit 7A to Housing Unit 7B. During the transfer, Sgt. McCoole did not observe any signs that Longmire was a suicide risk and Longmire did not express any suicidal ideations. (Ex. 19, McCoole Dep., p. 11-15)

Id. at 5.

25. As per policy, Sgt. McCoole checked Longmire's Mental Health classification and determined that he was MH-0, indicating that Longmire had no identified mental health problems and thus was to be screened within one working day after being placed in pre-hearing detention. (Ex. 19, McCoole Dep., p. 39)

26. As per policy, Sgt. McCoole sent an Electronic Detention Notice ("EDN") indicating that Longmire's housing assignment was changed from Housing Unit 7A to Housing Unit 7B for pre-hearing detention pending the assault charge. EDNs are distributed to and notify various ICCC administrators, including the psychologist that an inmate has been placed in pre-hearing detention and needs to be screened by a QMHP. (Ex. 19. McCoole Dep., p. 31-32)

27. Longmire refused two meals on November 8, 2014. (Ex. 20, Log)

28. At approximately 5:30 p.m. on November 8, 2014, Officer Smallwood, while performing a routine security check, observed Longmire hanging from a sheet. She called a medical emergency and notified Sgt. McCoole. Officer Smallwood and Sgt. McCoole were unable to cut the sheet due to its thickness and had to untie it by hand. After placing Longmire on the floor, they began CPR, and were then assisted by other correctional supervisors and officers, until medical arrived and took over. Despite the efforts, Longmire could not be revived. (Ex. 23, Incident Report)

29. EMS responded to ICCC and pronounced Longmire deceased at 5:47 p.m. (Ex. 24, EMS Record)

5

Id. at 6–7.

C.  **Disputed Facts**

The primary substantive dispute is about what Smallwood and McCoole heard and saw about D. Longmire. Regarding Smallwood, Defendants state as follows:

> 23. Deputy Smallwood performed security checks on Housing Unit 7B throughout the afternoon of November 8, 2014, including those between 4 p.m. and 5:30 p.m. Deputy Smallwood did not observe any physical or emotional signs that Longmire was suicidal, nor did she overhear Longmire state that he was going to hurt himself. Further, no other inmate told her that he was suicidal or was going to hurt himself. (Ex. 20, Log; Ex. 9, Smallwood Dep., pp. 14, 17, 142, 145-47)

Doc. 119 at 23. Plaintiff observes that Smallwood logged a security check at 12:55 PM and testified at her deposition that she performed that check, but a review of the video shows that she never actually performed that check. See Doc. 132 at 14 (citing Ex. 16 at 7; Ex. 4 ("Smallwood Dep. Tr.") at 73:14–22; 75:6–77:20). Plaintiff also summarizes the testimony of Joseph Carroll ("Carroll"), an inmate in a cell next to D. Longmire, regarding a suicide threat that she alleges Smallwood heard:

> Joseph Carroll was in the cell next to Longmire the entire day. Carroll confirms Longmire was screaming, hollering, and crying throughout the day. (Carroll Aff. ¶15-29; Carroll Dep. at 116:11-14, 118:8-24, 139:19-140:16.) At just before 5:00pm, Smallwood came by the cells to make her check. (Carroll Aff. at ¶ 41.) Longmire's cell was in disarray. (See Exhibit 15; Smallwood Dep. 96:8-97:6, 103:21-24.) As Smallwood was at Longmire's cell, he loudly yelled, **"I feel like I'm going fucking nuts. I feel like I'm going to fucking hurt myself."** (Carroll Aff. at ¶ 41-44; Carroll Dep. at 143:8-9.) In a sarcastic tone, Smallwood acknowledged Longmire's statement and said, **"mmm hmm."** (Carroll Aff. at ¶ 45-47.) She walked away and left the unit.

Doc. 132 at 14 (emphasis in original).

Regarding McCoole, Defendants state as follows:

> 22. Sgt. McCoole made security checks in Housing Unit 7B at 11:20 a.m. and 12:11 p.m. and was in the unit at other times during the afternoon. He did not

6

> observe any signs that Longmire was a suicide risk and did not hear Longmire express any suicidal ideations. Nor did any other inmate indicate that Longmire said he was going to hurt himself. (Ex. 20, Log; Ex. 19, McCoole Dep., pp. 138-41)

Doc. 119 at 6. Plaintiff admits the two (2) security check times but otherwise disputes several aspects of Defendants' account. Doc. 132 at 13–14. She notes that corrections officers are trained that signs of suicide risk include

> (a) "changes in typical behavior";
> (b) "extreme mood swings,"
> (c) "in ... emotional pain";
> (d) "statements that an inmate makes about harming himself or future desires to harm himself";
> (e) changes in sleep patterns, eating habits, energy level and/or ability to concentrate;
> (f) setting affairs in order, e.g., "the offender may have stacks of letters in his/her cell addressed to each family member";
> (g) giving away possessions; and
> (h) preoccupation with death, dying, or suicide.

Doc. 132 at 6 (citing Ex. 2 at 2199; Ex. 6 ("Halsey-Harris Dep. Tr.") at 50:4–15; 61:20–12). She then observes that McCoole saw several of these signs with D. Longmire. Id. at 10–12. Carroll testified that D. Longmire "would go from silence to loud outbursts of anger and crying and screaming" and that McCoole witnessed these outbursts. Id. at 10 (citing Ex. 12 ("Carroll Decl.") ¶¶ 36–39). He further described that D. Longmire "repeatedly tried to assure McCoole that he did not actually assault Smallwood and that he did not deserve the penalty against him." Id. (citing same). Two "cadre inmates," role model inmates who assist with other inmates, further testified about what McCoole saw. Id. Jerome Thompson ("Thompson") advised that McCoole told him and the other cadre inmate that D. Longmire had been screaming, yelling, and banging in his cell all day. Id. (citing Ex. 7 ("Thompson Decl.") ¶ 26). When speaking with D. Longmire, Thompson heard him scream "I'm gone," "I'm done with shit," "I'm outta here," and "I just want to talk to my momma before I go," and tell Thompson to say goodbye to other

7

inmates on his behalf. Id. at 11 (citing Thompson Decl. ¶¶ 29, 32, 33; Ex. 8 ("Thompson Dep. Tr.") at 65:14–67:13). Thompson also testified that D. Longmire tried to hand Thompson his mother's phone number on a piece of paper. Id. (citing Thompson Dep. Tr. at 66:25–67:2). Dean Stilke ("Stilke"), the other cadre inmate, stated that he saw and overheard some of the outbursts and asked McCoole to help. Id. (citing Ex. 11 ("Stilke Decl.") ¶¶ 44–46). He also indicated that more than one of the outbursts involved D. Longmire yelling that he was going to hurt himself. Id. (citing Stilke Decl. ¶ 51). Plaintiff notes that both cadre inmates testified that McCoole was present and refused to help and that video confirms his presence. See id. (citing Exs. 14, 16). In addition, Thompson indicated that McCoole was near D. Longmire's cell when D. Longmire asked to call his mom, and video confirms that McCoole was there with a phone. Id. (citing Thompson Decl. ¶¶ 33–34; Exs. 14, 16). Thompson also stated that McCoole forced him and Stilke to leave the area. Id. (citing Thompson Decl. ¶¶ 39, 44).

Beyond those two (2) key disputes, Plaintiff also disputed three (3) other facts on more minor grounds. The first disputed fact states:

> 4. Dr. James Brockington, ICCC's Qualified Mental Health Professional ("QMHP"), assessed Longmire on May 23, 2014. Longmire denied current mental health complaints, a history of suicide attempts, or current or ever receiving mental health treatment. Longmire reported that he had been diagnosed with bipolar disorder and depression at age 17 and said that his mood disorder was caused by extreme anxiety. He indicated he had been prescribed Xanax in the past; however, Xanax is not a treatment for bipolar disorder or depression. (Ex. 4, Brockington Progress Note 5/23/14; Ex. 5, Expert Report of Dr. James Levenson, p. 2)

Doc. 119 at 2. Plaintiff disputes that D. Longmire's mental health issues were not current, and she further disputes the suggestion that he did not have bipolar disorder or depression. See Doc. 132 at 13. The second disputed fact states:

> 20. At approximately 10:45 a.m. Longmire was transferred from Housing Unit 7A to Housing Unit 7B, for pre-hearing detention as per VDOC OP 861.1. (Ex. 14, VDOC OP 861.1)

Doc. 119 at 5. Plaintiff notes that the video shows a time of 11:20 AM. Doc. 132 at 13 (citing Ex. 16 at 2–3). The third disputed fact states:

> 24. Per VDOC OP 861.3, Special Housing, offenders placed in special housing, including for pre-hearing detention, are screened by a QMHP either before their placement or within one working day after placement in special housing so that any "at risk" offenders may be identified. Offenders with "identified mental health problems" placed in special housing are monitored per OP 730.5, Mental Health Services: Suicide Prevention and Behavior Management and OP 720.1, Access to Health Services. (Ex. 21, VDOC OP 861.3; Ex. 22, Blank DOC MH 14 – Mental Health Screening: Special Housing Assignment Form)

Doc. 119 at 6. Plaintiff responds to insist that the assigned mental health numerical code does not end the obligation for Defendants to act if the observed potential suicide warning signs or risk factors. Doc. 132 at 15.

## II. LEGAL STANDARDS

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure to rebut the motion with such evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . .

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the factfinder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

### III. ANALYSIS

The instant Motion seeks summary judgment on the issue of whether Defendants' actions constitute deliberate indifference. A prison official violates the Eighth Amendment by failing to prevent harm when two (2) requirements are met: the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and the prison official acts with "'deliberate indifference' to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted).

Deliberate indifference is a state of mind greater than negligence but lesser than purpose. Id. at 836. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "'[T]he key to deliberate indifference in a prison suicide case is whether the defendants knew, or reasonably should have known, of the detainee's suicidal tendencies.'" Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992), as amended (July 7, 1992) (quoting Elliott v. Cheshire County,

940 F.2d 7, 10–11 (1st Cir. 1991)). In proving that a prison official drew the inference that his actions were sufficient, a plaintiff cannot satisfy their burden merely by showing that the official objectively should have known of the substantial risk, but proof that the risk was obvious is sufficient for a reasonable factfinder to conclude that the official had actual knowledge of the substantial risk. Hearn v. Lancaster Cty., 566 F. App'x 231, 236 (4th Cir. 2014) (citations omitted). An official also cannot escape liability by "merely refus[ing] to verify underlying facts that he strongly suspected to be true." Id. at 236 (citations omitted). If the official "had no reason to suspect that the prisoner was a suicide risk," he is entitled to qualified immunity. Gordon, 971 F.2d at 1094.

There are material facts in dispute as to whether Smallwood's conduct constitutes deliberate indifference. An official who hears a specific suicide threat, is fully trained to take appropriate actions, and takes no action in response, is the quintessential deliberately indifferent officer. See Buffington v. Baltimore Cty., Md., 913 F.2d 113, 117–20 (4th Cir. 1990) (affirming deliberate indifference conviction of two officials who knew that an inmate was suicidal and took no action in response); see also Odom v. S.C. Dep't of Corr., 349 F.3d 765, 771 (4th Cir. 2003) (affirming deliberate conviction of official who "was both aware of an excessive risk of harm to [the inmate] and simply disregarded it"). None of Defendants' authority undermines that basic rule. In Ward, the official was not aware of the risk of suicide because the three (3) pieces of information he may have had — a scar on the inmate's wrist, a comment about giving his bicycle to a deserving person, and alcoholism — did not amount to a suicide threat. See Ward v. Holmes, 28 F.3d 1212, 1994 WL 313624 (4th Cir. 1994) (table decision). Similarly, in Boyd, the information that the official may have had — that the inmate was weeping — did not amount to a suicide threat. See Boyd v. Harper, 702 F. Supp. 578, 581 (E.D. Va. 1988). Boyd

also distinguishes its own facts from cases where the inmate "explicitly informed prison officials of his or her intention to commit suicide." Id. (citing Danese v. Asman, 670 F.Supp. 709 (E.D. Mich. 1987); Matje v. Leis, 571 F.Supp. 918 (S.D. Ohio 1983). The closest authority Defendants cite does involve an explicit suicide threat. See Estate of Cartwright v. City of Concord, Cal., 618 F. Supp. 722, 728 (N.D. Cal. 1985), aff'd, 856 F.2d 1437 (9th Cir. 1988). The threat was made under the influence of drugs or alcohol, and the Court found that the officials reasonably concluded that the threat was not serious. See id. The key factual difference is that the officials both (1) increased the frequency of their cell inspections and (2) had no reason to believe that the intoxicated inmate was actually depressed or suicidal. See id. Under Cartwright, perhaps some minimal response to D. Longmire's suicide threat would have been sufficient to avoid satisfying the deliberate indifference standard. Because it is undisputed that Smallwood took no action, though, the only issue left is whether she actually heard a threat requiring action. Viewing that factual dispute in Plaintiff's favor, the Court **DENIES** summary judgment as to Smallwood.

A reasonable jury could also find that McCoole's conduct is deliberate indifference. At least one (1) of the three (3) inmates, Stilke, stated that McCoole heard threats of self-harm. Defendants contest the accuracy of that statement, but because the Court must view all evidentiary disputes in Plaintiff's favor at this stage, the Court **DENIES** summary judgment as to McCoole.

Defendants argue that their conduct was negligence at worst and that they are entitled to qualified immunity. Doc. 119 at 11–15. Plaintiff's view of the facts arguably establishes deliberate indifference, and the Court cannot find as a matter of law at this stage that the conduct was only negligent. The qualified immunity argument is based only on the assertion that

Defendants did not violate D. Longmire's constitutional rights and does not otherwise argue that the rights were not clearly established. See Doc. 119 at 15. Thus, the issue of qualified immunity does not substantively differ from the merits arguments themselves in this case. Accordingly, neither of these arguments alters the conclusions above.

## IV. CONCLUSION

For the reasons set forth herein, the Court **DENIES** the Motion, Doc. 118. Because the Court is denying the Motion, the Court also **WAIVES** any further briefing on the related Motion for Leave to Supplement, Doc. 145, and **DENIES** that Motion for Leave **AS MOOT**.

The Clerk is **REQUESTED** to send a copy of this Opinion & Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November 29, 2017